WILMINGTON TRUST COMPANY, a corporation of the State of Delaware, Executor of the Last Will and Testament of Charles B. Holladay, deceased,

Complainant Below, Appellant,

*vs.*

GENERAL MOTORS CORPORATION, a corporation of the State of Delaware, FANNIE P. HOLLADAY, and FANNIE P. HOLLADAY, Executrix of the Last Will and Testament of William W. Holladay, deceased,

Defendants Below, Appellees.

WILMINGTON TRUST COMPANY, a corporation of the State of Delaware, Executor of the Last Will and Testament of Charles B. Holladay, deceased,

Cross Defendant Below, Appellant,

*vs.*

FANNIE P. HOLLADAY, Individually and as Executrix of the Last Will and Testament of William W. Holladay, deceased,

Cross Complainant Below, Appellee

and

GENERAL MOTORS CORPORATION, a corporation of the State of Delaware,

Cross Defendant Below, Appellee.

*Supreme Court, On Appeal, January 31, 1947.*

RICHARDS, C. J., SPEAKMAN, TERRY and CAREY, *JJ.*, sitting.

*Arthur G. Logan,* of Logan & Duffy, for complainant.

*Clarence A. Southerland,* of Southerland, Berl & Potter, and *Murray G. James,* of Wilmington, N. C., for Fannie P. Holladay, individually and as executrix of last will and testament of William W. Holladay, deceased, defendant.

RICHARDS, Chief Justice, delivering the opinion of the court:

It is admitted that the court is called upon to determine in this case the plain question of fact of what was intended by the original complainant, Charles B. Holladay, and under- stood by his brother, William W. Holladay, and his said brother's wife, Fannie P. Holladay, when the General Mo- tors common stock which is the subject of this litigation was transferred to them.

There is no better way to consider this question than to take up what transpired between the parties step by step and thus ascertain what the real purpose and intention of the transaction was.

The correspondence between the parties brings out the inescapable fact that the original complainant, Charles B. Holladay, was in better financial circumstances than his said brother, William W. Holladay, and that he had been rendering his said brother financial assistance prior to the transfer of the General Motors stock. It also appears, and

is not in dispute, that the said William W. Holladay was in poor health at the time said General Motors stock was transferred to him and had been for some time prior thereto and was largely dependent for a livelihood upon a pension which he received from the Atlantic Coast Line Railroad Company. The record discloses that in the early part of the year 1919 the said original complainant, Charles B. Holladay, transferred to his brother, William W. Holladay, two hundred (200) shares of common stock of the General Motors Corporation and caused said stock to be registered in the name of the said William W. Holladay on the corporation's stock register. This act not only amounted to an admission by Charles B. Holladay that his brother William was the owner of said shares of common stock of General Motors Corporation, but caused his said brother William to be recognized as the owner of said stock by said General Motors Corporation at least so far as the payment of dividends was concerned. By this act of causing said stock to be registered in the name of his brother William, the said Charles B. Holladay made it possible for any one examining the stock register of said corporation to at least get the impression that said stock belonged to his brother William.

It appears that William received a letter from his brother Charles in February, 1919, in reference to the transfer of the stock in question. Whether that letter disclosed what Charles intended to do when he transferred said stock and had it registered in the name of his brother William, we are unable to say as it has been misplaced and is not before us. The first reference which the record makes of the transaction is William's reply to said letter dated February 5th, 1919, in which he said:

"I received your letter today, and to try to thank you or express my gratitude for what you have done for me would be impossible. I have been holding the subscription warrant and dividend check as I did not feel that I had any right to them until I heard from you. I don't know how to tell you how thankful I am and I could not realize that you intended for me to get the benefit of the stock, as you had already done so much for me and been so generous."

This letter confirms the understanding that Charles had been giving financial assistance to William and expresses his appreciation therefor. It does not, however, throw any light upon what Charles really intended to do when he had the stock registered in William's name. It is true that the certificate for said 200 shares of common stock of General Motors Corporation was never delivered to the said William W. Holladay but was retained by the said Charles B. Holladay. ·

On the twenty-sixth day of May, 1919, the said Charles B. Holladay caused to be transferred from the name of William W. Holladay, under an irrevocable power of attorney which he held, to the name of Fannie P. Holladay 100 shares of said common stock of General Motors Corporation which he had originally transferred to the said William W. Holladay. Although said stock was likewise registered in the corporation's stock register in the name of Fannie P. Holladay the certificate therefor was retained by the said Charles B. Holladay and he held a power of attorney authorizing him to transfer the same. The best explanation for this course appears in the letter of October 8, 1926, which Charles B. Holladay wrote to his brother, William W. Holladay, in which he said:

"I had this stock transferred as above indicated to keep you from want as you appeared in need of support and I think you must to have understood quite plainly that I undertook the custodianship merely for its preservation and to take away any temptation you might have to squander."

In the same letter he also said "I shall not hesitate to sell any or all of the stock if it appears advisable to do so or if you request it, but I will not speculate with the proceeds." Here again Charles expresses his intention to supervise the handling of the investment in order that William's income may be assured, but disclaims his ownership of the stock when he states that he will sell it if William requests it, and further states that he will not speculate with the proceeds. If Charles claimed the ownership of the stock,

why did he agree to sell it at William's request or why did he agree not to speculate with the proceeds if he did sell it?

While 100 shares of said common stock of General Motors Corporation were registered in the name of William, and 100 shares of said common stock of General Motors Corporation were likewise registered in the name of Fannie various stock exchanges were authorized and stock dividends declared by said General Motors Corporation, until eventually 1875 shares of said common stock of General Motors Corporation were registered in the name of William and 1875 shares of said common stock of General Motors Corporation were registered in the name of Fannie. This additional stock or new stock was registered in the respective names of William or Fannie and the dividends declared thereon received by them.

Both William and Fannie seemed quite content for Charles to hold the certificates for the stock together with stock powers of attorney for its transfer. This is understandable because their letters show that they recognized him as their benefactor and were willing for him to handle the investment for them. When, however, Charles opened a brokerage account in William's name and bought 1000 shares of Warner Brothers Pictures stock using 2500 shares of General Motors common stock as collateral security therefor, they showed concern that said General Motors common stock might have to be sold and they would become responsible beyond their ability to pay. This clearly appears from William's letter of December 9, 1933, in which he said:

"You know my circumstances and that if the stocks were wiped out by shrinkage in the market value, I could not possibly pay the loss, and I don't believe you would wish me to take any such risk."

After the brokers had sold a portion of the 2500 shares of common stock of General Motors Corporation which had been deposited as collateral security for the purchase of 1000 shares of Warner Brothers Pictures stock, there remained

in their hands 1500 shares of the common stock of General Motors Corporation and $1700 in cash. Charles consulted William to learn in whose name he desired these remaining 1500 shares to be registered and how he desired the cash to be divided. See letter of January 16th, 1939. If said stock belonged to Charles it seems incredible that he would call upon William to advise him in whose name it should be registered, or who should receive the money remaining in the hands of the brokers from the sale of other stock.

On October 26, 1925, Charles in replying to a letter from Fannie in which she requested him not to sell the General Motors Common stock said,

"I presume you refer to the stock which I gave Willie, half of which was transferred to your name in order to save a possible excess inheritance tax in case of his death."

In replying to Willie on December 29th, 1927 Charles used the following language which we think indicates who he considered was the owner of the common stock of General Motors Corporation which is involved in this litigation,

"You have never intimated to me how you wished your General Motors stock divided in case of your death. I should like to have your views on the subject and I would suggest you mention percentages instead of shares as shares wouldn't mean much should there be an increase or reduction."

If the stock did not belong to William it would not be necessary to take steps to save a possible excess inheritance tax in case of his death, or if he did not own the stock it would likewise be unnecessary for him to give any instructions about how he wished the stock to be divided after his death.

We have not lost sight of the fact that Charles at all times held stock powers of attorney authorizing him to transfer the stock, and that he expressed his intention on a number of occasions to do as he pleased with it, but this was in pursuance of the intention which he originally expressed to act as custodian of the shares for their preserva-

tion and to take away any temptation which William might have to dissipate the provision which he had made for him.

In his letter to William dated January 19, 1922, in referring to the manner in which William and Fannie had used the income which they had received from said common stock of General Motors Corporation Charles said,

"I must confess I am very much disappointed and feel that you are totally incompetent to manage anything."

In his letter of October 4th, 1926, after referring to certain certificates of stock which had been received as stock dividends he said,

"I am amazed at your not sending this stock to me for safe keeping and I am extremely disappointed that I have to suggest to you that this stock be sent to me at once."

This is not the language which a person would use in talking about something which belongs to him, but rather the language which would be used in speaking of something which belonged to someone else over which he exercised supervision.

In his letter of September 30th, 1927, in acknowledging receipt of powers of attorney authorizing the transfer of the stock this language was used:

"I note your request that I do not sell any of this stock without first obtaining your consent. I wish to have it distinctly understood that I shall do whatever seems to me best in regard to selling or otherwise disposing of this stock, without consulting you or anyone else, and I do not care to have any further suggestions or commands regarding the same."

Again on January 18, 1932, in writing him in reference to assisting his daughter who was in financial trouble he said:

"I also wish to remind you that when I had the General Motors stock transferred to you I told you that I would keep it in Wilmington, Delaware, and do with it as I pleased."

Replying to William's letter in reference to the stock

which was deposited with the brokers as collateral security Charles said on June 15th, 1932,

"In regard to sale or transfer I have written you and told you that I would do as I chose about it at any time I saw fit. When I had this stock transferred to you originally you were told this, and I am not at all pleased at the show of yellow when things go wrong."

He made further reference to this transaction in a letter of November 9, 1933, in which he expressed himself in the following manner:

"I told you in the beginning when I had the stock of General Motors Corporation first transferred to you and Fannie that I expected to do with it as I chose. You have fully understood this and rather than quibble about the matter, you and Fannie might also sign the letter, might write me a typewritten letter, that you might retain a copy setting forth this understanding fully and plainly."

We admit that this is strong language but recalling that the original intention of Charles was to provide for the support of his brother who was in poor health, we can understand why he should desire to have an oversight of the investment even to the extent of disposing of the stock, if he considered it necessary.

William wrote to Charles on November 22, 1933, in reference to the stock and made this comment:

"Of course, I understand and appreciate the fact that this stock was a gift from you, but in consideration of the fact that a trust agreement was proposed by you for the future administration of the fund and you expressed the desire to know how I wished this stock disposed of after my death, I have felt all the time that we were the owners of the stock, and that you so considered us."

We think it is very significant that Charles apparently made no reply to this statement or commented upon it in any way.

Much reliance is placed upon the correspondence between Charles and William in 1933 leading up to William's letter of November 29th, 1933, together with the contents of said letter, in which he said:

"In order that there may be no misunderstanding regarding the General Motors Corporation common stock which you have in your possession and which is registered in the name of William W. Holladay and Fannie P. Holladay, we understand fully and clearly that this stock was originally issued in our names by you and that the number of shares now standing in our names over and above the original number issued have resulted from stock dividends.

"That you reserved the right to use the stock in any way you wished."

We cannot agree, however, that this letter admits that Charles was the owner of the stock. It was intended for his use in managing the investment and as evidence of his authority whenever he considered it necessary to change the nature of the investment.

William died on November 18, 1940, leaving a last will and testament by which he gave said common stock of General Motors Corporation registered in his name to his wife, Fannie, and named her executrix of his estate. Fannie then individually and as executrix of the last will and testament of William, revoked all stock powers of attorney which had been given to Charles by them from time to time enabling him to manage the investment represented by said shares. In connection with the settlement of the estate Charles wrote a letter to Mr. Richard S. Rogers, Trust Officer of Wilmington Savings and Trust Company, of Wilmington, North Carolina, in which he stated that he had in his possession 2750 shares of common stock of said General Motors Corporation, 875 shares of which were in William's name and 1875 shares of which were in Fannie's name. Referring to the time the stock was issued in their names he said, "It was distinctly understood that I reserved the right to dispose of the stock in any way that I may desire." In the same letter he suggested that he would divide the stock among Fannie and three other people.

On January 13th, 1941, Carr, James and Carr who represented Fannie as executrix of William's estate, wrote to Charles requesting him to forward them the certificates

standing in William's name so that they could proceed with the administration of the estate. He replied to this letter denying that the stock standing in William's name belonged to the estate in the following language:

"Replying to your letter of the 13th, requesting me to send to you or to Mrs. W. W. Holladay 875 shares General Motors Common stock which you say belongs to the estate of W. W. Holladay. Beg to advise I do not consider these shares above mentioned belong to the estate of W. W. Holladay and I am therefore unable to comply with your request."

It is contended that neither Fannie nor her attorneys challenged or denied the position taken by Charles in the above mentioned letters, and that this constitutes an admission by silence that the stock did not belong to William during his life time or to his estate after his death. The fact that Fannie after William's death, cancelled all stock powers of attorney which had been given to Charles by William and herself, and caused a stop order to be placed with General Motors Corporation, constitutes a complete denial that Charles was the owner of said common stock of General Motors Corporation for which certificates had been issued in their names. The letter which her attorneys, Carr, James and Carr, wrote to Charles requesting him to forward to them the stock certificates standing in William's name which he held, amounted to the assertion of a claim by them that the stock belonged to William and it was unnecessary for them to deny the statement contained in Charles' reply that the stock did not belong to William's estate.

The argument was also made that William and Fannie's failure to deny the statements made by Charles in his letters to them, to the effect that he would dispose of the stock in any way that he cared to, amounted to an admission by silence that Charles was the owner of the stock. On the contrary, we think that this simply shows that they recognized Charles as the custodian of the stock and were willing for him to handle it in the manner that he thought best.

They were well aware of the generous treatment which they had received from Charles and recognizing his broad experience in financial affairs were willing to allow him to handle the investment for them.

The argument was made that there was a variance between the allegations of Fannie's cross bill and amended cross bill and the proof on account of which she was not entitled to any relief. In support of this argument it was pointed out that the cross bill and amended cross bill set forth, that Charles originally gave 200 shares of the common stock of said General Motors Corporation to William, after which William made a gift of 100 shares of said stock to Fannie; and that after the gift to William and before William's gift to Fannie, Charles had possession of the certificates for said stock as the custodian for William; but Fannie testified that the stock was given to her by Charles. The proof is that in January, 1919, Charles had 200 shares of stock transferred to William, and that in May of 1919, while Charles was visiting William and Fannie in Wilmington, North Carolina, at the suggestion of Charles, William transferred 100 shares of said stock to Fannie. Both William and Fannie admitted that Charles had been very kind to them and expressed their appreciation therefor on many occasions. Fannie knew that all of the stock originally belonged to Charles who, in the first instance, transferred it all to William. Even though she testified that Charles gave the stock to her, judging from all the evidence in the case, we are not required to interpret her testimony as meaning that the certificates were actually transferred to her by Charles. Knowing, as she did, that the stock originally belonged to Charles who transferred it to William in the first instance, it was not unnatural for her to consider Charles as the person who had contributed so much to her comfort. It should also be borne in mind that a long time had elapsed between the transfer of the stock and the time when she gave her testimony before

the Vice-Chancellor, and a woman of her age could not be expected to be accurate in every detail.

The rule that an unfavorable inference may be drawn from the failure of a party without satisfactory explanation, to produce evidence properly a part of a case, which is within his control, is not applicable under the facts of this case. Fannie testified that the first letter that Charles wrote William telling about the transfer of the stock to him was placed in the tin box where William kept his correspondence. She produced the tin box and contents upon request but this letter was not found and it is contended that the failure to find it gives rise to a legal presumption that if the letter had been produced it would have been unfavorable to her. Direct reference is made to this letter in William's letter to Charles dated February 5th, 1919 in which he said "I received your letter today, and to try to thank you or express my gratitude for what you have done for me would be impossible." Throughout the correspondence which followed between Charles and William, its contents was not made known. When Fannie was asked about what happened to this first letter she replied "I don't know that I know. I don't know that I could remember that." When pressed further for an answer she stated "No, I don't know where it is." When asked the question, "Do you recall seeing that letter when you opened the box after your husband died," she replied "I don't recall it Mr. Logan, but I am sure it was. It must to have been there." This testimony shows that Fannie's recollection was not clear whether this particular letter was in the tin box when she opened it, but it does appear clearly that she was testifying to the best of her recollection and there is no intimation that she was attempting to conceal anything. There is nothing in the record to justify the conclusion that Fannie withheld this letter or had any knowledge of its whereabouts. What the contents of the letter was we are unable to say and it may have been simply corroborative of other evidence found

in the record. *Buckley, v. R. H. Johnson & Co.,* 2 *Terry* 546, 25 *A.2d* 392.

The contention was made that Charles never intended to make a gift of the stock itself and that it appears from an examination of the record, that there was no such intention to make a gift; that the gift was not complete; that the stock was not delivered by the donor and accepted by the donee; that the gift as alleged did not go into immediate and absolute effect and that said gift as alleged was not irrevocable. We find there is no distinction between a gift of a certificate of stock and other classes of property, and there is no doubt that a certificate of stock may be the subject of a gift, if it clearly appears that there was an intention to make the gift and sufficient delivery. 24 *Am. Jur.* 770; *Phillips v. Plastridge, et al.,* 107 *Vt.* 267, 179 *A.* 157, 99 *A.L.R.* 1074; *Grymes v. Hone's Ex'rs.,* 49 *N.Y.* 17, 10 *Am.Rep.* 313; *Herbert v. Simson,* 220 *Mass.* 480, 108 *N.E.* 65, *L.R.A.* 1915D, 733; and *McAllister v. McAllister Coal Co.,* 120 *N.J.Eq.* 394, 184 *A.* 716.

The general principle governing the gift of corporate stock is very clearly expressed in 24 *Am.Jur.* 771 in the following language:

"Generally, there is a complete gift of corporate stock where, by the direction of its owner, it has been transferred to the donee on the books of the corporation, and a new certificate issued in the name of the donee, or a certificate is issued in the first instance in the name of the donee, although the certificate so issued is retained by the donor or the corporation, and is not delivered to the donee. Thus, where a donor causes a certificate of stock to be issued in the name of the donee, retaining possession thereof himself, but at all times regards the certificate as the property of the donee and his own possession as that of a trustee of a donee, the delivery to himself as trustee of the donee is sufficient to complete the gift. Similarly, a completed gift of corporate stock is made by causing it to be issued in the name of another although the certificates are not detached from the stock book and are not delivered to the donee but remain in custody of the corporation, and the donee is ignorant of the transaction at the time."

In 28 *C.J.* 646, 38 *C.J.S.*, *Gifts*, § 36, the above stated principle is thus supported:

"But the mere fact that a gift is accompanied by a condition or qualification not inconsistent with the vesting of title in the donee does not necessarily render it invalid."

Where a new stock certificate is issued in the name of a donee, and so registered on the books of the corporation, it is not necessary that said stock certificate be in possession of the donee in order to complete the gift. *Reed v. Roberts*, 85 *Pa.* 84; *Chicago Title & Trust Co. v. Ward*, 332 *Ill.* 126, 163 *N.E.* 319; *Fall River Nat. Bank. v. Estes*, 279 *Mass.* 380, 181 *N.E.* 242; *Jean v. Jean*, 207 *Cal.* 115, 277 *P.* 313; *Thomas v. Thomas*, 70 *Colo.* 29, 197 *P.* 243; *Phillips v. Plastridge*, 107 *Vt.* 267, 179 *A.* 157, 99 *A.L.R.* 1074.

After a careful consideration of all the facts of this case, and the law applicable thereto, we are of the opinion that when the common stock of General Motors Corporation was transferred by Charles to William and registered in William's name on the books of the corporation he became the owner thereof. Likewise when Charles had William transfer half of the stock to Fannie and caused it to be registered in her name on the books of the corporation she became the owner thereof. By retaining possession of the certificates for the stock which was issued in the name of William and Fannie, Charles was acting as custodian for the stock in order that he might be assured that the provision he had made for his brother and his wife might be protected at all times and they would receive the benefit which he intended for them.

The decree of the Chancellor is hereby affirmed.