William M. KALLOP, Defendant
Below, Appellant,

v.

Brian A. McALLISTER, Plaintiff
Below, Appellee.

No. 312, 1995.

Supreme Court of Delaware.

Submitted: April 16, 1996.
Decided: June 26, 1996.

Samuel A. Nolen (argued), and Robert J. Stearn, Jr., Richards, Layton & Finger, Wilmington; Of Counsel: Clinton B. Fisher and Steven R. Schoenfeld, Haythe & Curley, New York City, for appellant.

Wayne N. Elliott (argued), and Bruce E. Jameson, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington; Of Counsel: James E. Tolan and Rodney M. Zerbe, Dechert Price & Rhoads, New York City, for appellee.

Before WALSH, HOLLAND, and HARTNETT, JJ.

HARTNETT, Justice.

In this interlocutory appeal, we affirm the Court of Chancery's holding that the transfer of a share of corporate stock was valid although only a constructive delivery of the share took place. In so holding, we find that Article 8 of the Uniform Commercial Code

(UCC), as it existed in 1979 in Delaware, did not displace the doctrine of constructive delivery that is a part of the Delaware common law.

**I.**

The Court of Chancery, after a trial, concluded that Appellant–Defendant below, William M. Kallop ("Kallop"), by a written agreement, effectuated a gift to the corporation of one of his 100 shares of stock of McAllister Towing & Transportation, Inc. ("McAllister Towing"). *McAllister v. Kallop,* Del.Ch., C.A. No. 12856–NC, 1995 WL 462210 (July 28, 1995). In reaching its conclusion, the Court of Chancery held that a constructive delivery of the stock certificate of McAllister Towing was adequate to vest the title to the share of stock in the corporation. Kallop challenges this holding and urges that, as a matter of law, a legal transfer of corporate stock occurs only when the transfer is effectuated in accordance with the express provisions of Article 8 of the UCC. These provisions, according to Kallop, were not complied with in this matter. In addition, Kallop argues that if constructive delivery is still effective to validate a transfer of corporate stock in Delaware the Vice Chancellor erred in finding that a constructive delivery took place under the facts of this case. Kallop also contends that the Vice Chancellor erred when he held that the claim of Appellee–Plaintiff below, Brian A. McAllister ("Brian"), was not barred by waiver, estoppel or laches.

We find that under Article 8 of the Uniform Commercial Code as it was in effect in Delaware in 1979, when Kallop signed the written agreement ("the Letter Agreement"), constructive delivery remained effective to validate the conveyance of stock.[1] Further, we find that the Vice Chancellor properly evaluated the facts before him when he determined that a constructive delivery had occurred and in determining that Brian's

---

1. Unlike the Court of Chancery, we do not base our decision on the current version of Article 8 of the Uniform Commercial Code. In 1983 the General Assembly amended 6 Del.C. § 8–313 (UCC). 64 Del.Laws, c. 152, § 6. Because the amended section 8–313 has no bearing on this appeal, we decline to address the effect of the statute as it reads today on a transfer of securities attempted through common law constructive delivery. Unless otherwise indicated, all references to Article 8 are to the version in force in 1979.

claim to enforce the 1979 transfer was not barred by waiver, estoppel or laches.

## II.

Brian and Kallop are the two remaining shareholders of McAllister Towing. The corporation was formed in 1969 by Brian, his brother Anthony McAllister, and his cousins Neil and James McAllister as a vehicle for acquiring the family tugboat company, McAllister Brothers, Inc. ("McAllister Brothers"), then owned by the prior generation of McAllisters.

In the early 1970s, Brian recognized that his group was in danger of losing its bid to purchase McAllister Brothers because another group was very close to closing a deal for it. In an attempt to strengthen his group's chances, Brian invited Kallop to invest in McAllister Towing. Kallop, who had been working with a third group also trying to acquire McAllister Brothers, agreed to join McAllister Towing as an equal stockholder.

In the continuing effort to improve McAllister Towing's prospects of buying McAllister Brothers, another of Brian's brothers, Bruce, also became a stockholder of McAllister Towing. Prior to the successful acquisition of McAllister Brothers by McAllister Towing, Kallop was issued an extra share of McAllister Towing stock in order to minimize the tax liability on the proceeds accruing to Anthony McAllister senior, Brian's father, from the sale of his interest in McAllister Brothers and thereby secure the senior McAllister's approval of the transaction. As a result, when the acquisition of McAllister Brothers was completed on July 18, 1974, Kallop held 100 shares of McAllister Towing and Brian held 99 shares.

Notwithstanding the issuance of the extra share of stock to Kallop, the stockholders agreed that each would have an equal say in the management of McAllister Towing. To reflect this, they entered into a Stockholders Agreement, also on July 18, 1974, that provided each stockholder with identical management rights and compensation irrespective of their actual stock holdings. The stockholders made nominally different capital contributions to McAllister Towing, but they all undertook an equal obligation to repay the debts of the company.

In order to finance the purchase of McAllister Brothers, at the time of the acquisition the certificates of all six stockholders of McAllister Towing were pledged and held as collateral for loans made to the corporation by First Pennsylvania Bank and by Industrial National Bank of Rhode Island. The certificates were later assigned and pledged as collateral to Citibank when McAllister Towing refinanced its debt obligations in April of 1977. Citibank returned these certificates to the company in December of 1979.

On August 15, 1979, Kallop executed (and Brian countersigned on behalf of the company) the one-page Letter Agreement which is the basis of this lawsuit. The Letter Agreement is in the form of a letter from Kallop to McAllister Towing. It states:

> I believe that it will be in the best interest of McAllister Towing and Transportation Company, Inc. (the "Company") and will contribute to its success and future growth if I contribute one share of Common Stock of the Company owned by me to its capital. Accordingly, I hereby give, transfer and deliver to the Company one share of Common Stock as a contribution to capital. At the request of the Company, I shall execute such further documentation, if any, as may be necessary or desirable to fully effectuate such transfer.

The Vice Chancellor found that McAllister Towing has had possession of the original Letter Agreement since August of 1979, although Kallop's original stock certificate for 100 shares has never been revised to reflect the gift.

For reasons generally unrelated to the present dispute, between late 1979 and 1985, four of the shareholders transferred their respective interests in McAllister Towing to the corporation, leaving Brian and Kallop as the only stockholders. Although the stock certificates, issued in 1974, showed that Brian had been issued 99 shares and Kallop 100 shares, after 1985, Brian and Kallop operated McAllister Towing as equal co-owners, but their relationship became increasingly contentious. In 1993, Brian filed this suit in the Court of Chancery seeking, among other

things, a determination of whether Kallop owns one more share in McAllister Towing than he does or whether he and Kallop own equal shares in the corporation.

### III.

After trial, the Vice Chancellor found that the Letter Agreement was an attempt by Kallop in 1979 to make a gift to the corporation of one share of his McAllister Towing stock. The court recognized, however, that pursuant to Article 8 of the Delaware Uniform Commercial Code all transfers of stock require both indorsement and delivery. The court correctly found that the Letter Agreement itself satisfied the indorsement requirement and then focused on the element of delivery.

Because Citibank held all the stock certificates of McAllister Towing when the Letter Agreement was executed (including Kallop's certificate for 100 shares), the court found that physical delivery of Kallop's certificate was not a reasonable option. After determining that the formal requisites for a transfer of a share of stock set forth in Article 8 had not been met, the court nonetheless concluded that "[t]he simultaneous execution of the Letter Agreement by Kallop and Brian, and [McAllister Towing's] retention of possession of the Letter Agreement, symbolically satisfied the delivery requirement." It accordingly ruled that Kallop had made an enforceable gift to McAllister Towing of one of his shares.

### IV.

We first address the propriety of the Vice Chancellor's reliance on a constructive delivery to validate Kallop's gift of one share of his stock in McAllister Towing to the corporation.

Prior to the 1966 enactment of the Uniform Commercial Code in Delaware, it was clear that a transfer of securities could be accomplished through constructive delivery. *See Wilmington Trust Co. v. General Motors Corp.*, Del.Supr., 51 A.2d 584 (1947); *Hill v. Baker*, Del.Super., 102 A.2d 923 (1953); *Equitable Trust Co. v. Gallagher*, Del.Ch., 67 A.2d 50 (1949). At common law, a gift of stock ownership could be completed by "actual or constructive delivery" and, in certain circumstances, a writing alone could suffice to transfer shares of stock even if there was no physical delivery of the stock certificate. *Equitable Trust*, 67 A.2d at 54.

Reflecting the adoption of the Uniform Commercial Code in Delaware, the Delaware General Corporation Law was amended in 1967 to provide that shares of stock in a Delaware corporation be transferred in accordance with 6 Del.C., Article 8, Subtitle I (UCC). 8 Del.C. §§ 159, 56 Del.L. c. 506. The section of Article 8 (UCC) that speaks directly to the transfer of stock is 6 Del.C. § 8–313 (UCC) and its relevant portion, as it existed in 1979, stated:

(1) Delivery to a purchaser occurs when (a) he or a person designated by him acquires possession of a security; or (b) his broker acquires possession of a security specially indorsed to or issued in the name of the purchaser; or (c) his broker sends him confirmation of the purchase and also by book entry or otherwise identifies a specific security in the broker's possession as belonging to the purchaser; or (d) with respect to an identified security to be delivered while still in the possession of a third person when that person acknowledges that he holds for the purchaser; or (e) appropriate entries on the books of a clearing corporation are made under Section 8–320.

It is uncontested that Kallop's signing of the Letter Agreement in itself did not constitute a delivery under these express requirements because Citibank, the third party in possession of Kallop's stock certificate, never acknowledged the transfer of one of Kallop's shares to McAllister Towing.

Article 8 of the UCC, as it existed in Delaware in 1979, however, did not preclude the validity of a stock transfer accomplished by methods that are not listed in 6 Del.C., § 8–313 (UCC). Constructive delivery remains effective to validate a transfer of corporate stock in Delaware unless it has been displaced by the Uniform Commercial Code. As explained in *Acierno v. Worthy Bros. Pipeline Corp*, Del.Supr., 656 A.2d 1085, 1088–92 (1995), pursuant to 6 Del.C. § 1–103

(UCC) the provisions of the Uniform Commercial Code are generally supplemented by principles of law and equity.[2] In *Acierno*, relying on 6 Del.C. § 1–103 (UCC), we found that the common law doctrine of accord and satisfaction had not been displaced by Delaware's adoption of the Uniform Commercial Code. In so finding, we reasoned that common law principles are only preempted when "displaced by a particular provision in the Uniform Commercial Code." *Id.* at 1089 (citing *Stultz Elec. Works v. Marine Hydraulic Eng'g Co.*, Me.Supr., 484 A.2d 1008 (1984)). Following the dictates of *Acierno* and 6 Del.C. § 1–103 (UCC), the viability of constructive delivery as a method of validating the transfer of corporate stock hinges on whether Article 8 of the UCC, as it existed in 1979, specifically displaced that doctrine.

## V.

There is some disagreement in other jurisdictions as to the effect of Article 8 of the UCC on common law constructive delivery. Many courts have held that the validity of constructive delivery was not displaced by the adoption of Article 8. *Johnson v. Dodgen*, Iowa Supr., 451 N.W.2d 168, 174 (1990) (recognizing the validity of constructive delivery in transactions governed by the UCC); *Hill v. Warner, Berman & Spitz*, 197 N.J.Super. 152, 484 A.2d 344, 348–49 (1984) (constructive delivery allowed, notwithstanding UCC provisions listing specific methods of delivery); *In re Carroll*, 100 A.D.2d 337, 474 N.Y.S.2d 340, 342 (1984) (delivery requirement for gift of registered stock certificates "may be fulfilled ... by a symbolic delivery"); *Tanner v. Robinson*, Fla.Ct.App., 411 So.2d 240, 242 (1982) ("[P]rovisions of the UCC are not exclusive and do not undercut the validity of a gift of securities which is otherwise effective under common law standards."). *But see Bankwest, N.A. v. Williams*, S.D.Supr., 347 N.W.2d 163, 164 (1984) (holding that UCC provisions preclude a constructive delivery).

## VI.

We find that Article 8 of the UCC (as it existed in 1979) did not displace common law constructive delivery. There is nothing in the text of 6 Del.C. § 8–313 (UCC) or in its legislative history to indicate that it displaced that common law doctrine.

The issue of whether Article 8 displaced the principle of common law constructive delivery of corporate stock is one of statutory interpretation and is thus appropriate for *de novo* review by this Court. *State Dept. Of Labor v. Reynolds*, Del.Supr., 669 A.2d 90, 92 (1995); *Acierno v. Worthy Bros. Pipeline Corp.*, Del.Supr., 656 A.2d 1085, 1088 (1995); *Alfieri v. Martelli*, Del.Supr., 647 A.2d 52, 53 (1994). We must look to ascertain the legislative intent where, as here, the effect of a statute is unclear. *Acierno*, 656 A.2d at 1088; *Alfieri*, 647 A.2d at 56.

In interpreting a statute, we give considerable deference to an official commentary written by the statute's drafters and available to the General Assembly before the statutory enactment. *Stigars v. State*, Del. Supr., 674 A.2d 477, 483 (1996); *Acierno*, 656 A.2d at 1090; *see Snell v. Engineered Systems & Designs. Inc.*, Del.Supr., 669 A.2d 13, 17 (1995) (use of synopsis).

The Delaware Study Comment and the official commentary to the UCC prepared by the National Conference of Commissioners on Uniform State Laws and the American Law Institute which existed when the Uniform Commercial Code was adopted in Delaware in 1966 indicate that section 8–313 was not intended to displace common law constructive delivery. The Uniform Law Commissioners' Comment and the Delaware Study Comment that accompanied the enactment of the UCC in 1966 cite section 191 of the Uniform Negotiable Instruments Act (codified at 6 Del.C. § 291, which was repealed upon the enactment of the UCC in Dela-

---

**2.** 6 Del.C. § 1–103 provides:
Unless displaced by the particular provisions of this subtitle, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and

agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

ware).[3] It governed stock transfers before the enactment of the UCC. The Uniform Negotiable Instruments Act defined delivery of a security as the "transfer of possession, *actual or constructive*, from one person to another." (emphasis added). The Delaware Study Comment specifically notes that 6 Del.C. § 8–312 (UCC) "is in accord with these provisions."

The commentary accompanying the 1977 revision to Article 8 further supports the conclusion that Article 8 was not intended to displace common law constructive delivery. In a 1977 revision of the Uniform Commercial Code, which was not adopted in Delaware until 1983, the word "only" was added to the first sentence of section 8–313 (UCC). The Uniform Law Commissioners' official comment accompanying that revision states that "only" was added "to provide that the methods of transfer listed are exclusive and that compliance with one of them is essential to a valid transfer." U.C.C. § 8–313, 2C U.L.A. 403–04 (1991) (section revised 1977). Implicit in this comment is the drafter's recognition that, prior to the 1977 revision, section 8–313 did not purport to be an exclusive list of the only methods of effectuating a valid transfer of securities. Cf. *Stiftel v. Malarkey*, Del.Supr., 384 A.2d 9, 13 (1977) (discussing the general presumption that a legislative body does not amend statutory language without intending to change legal rights); 1A Sutherland Statutory Construction, § 22.30 (5th ed.1992).

Because 6 Del.C. § 8–313 (UCC), as it existed in 1979, did not enumerate exclusive methods of transferring securities, common law constructive delivery continued to supplement the methods of transfer listed in 6 Del.C. § 8–313.

## VII.

■ The Vice–Chancellor's ruling that McAllister Towing's receipt of the Letter Agreement constituted a valid constructive delivery of the one share of stock is adequately supported by the record and appears the product of an orderly and logical deductive process. Accordingly, that factual determination will not be disturbed by this Court. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

Constructive delivery of corporate stock, under the common law, is sufficient in instances when actual transfers of physical possession is impractical. *See* 4 *Pomeroy's Equity Jurisprudence* § 1149, at 397–98 (5th ed.1941). It requires an unmistakable intention to transfer title without transferring possession. *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 452 F.Supp. 1108, 1117 (S.D.N.Y.1978) (citations omitted). To effectuate a constructive delivery, the delivery must be as perfect as the circumstances reasonably permit. *In re Szabo's Estate*, 10 N.Y.2d 94, 217 N.Y.S.2d 593, 594–95, 176 N.E.2d 395, 396 (1961); *see Wilmington Trust Co. v. General Motors Corp.*, Del. Supr., 51 A.2d 584 (1947). An agreement "purporting to assign and transfer shares of corporate stock" may be sufficient in itself to complete the delivery of a gift. *Equitable Trust Co. v. Gallagher*, Del.Ch., 67 A.2d 50, 54 (1949).

In executing the Letter Agreement, Kallop clearly manifested his intention to transfer one share of McAllister Towing stock to the corporation. The Letter Agreement states: "I hereby give, transfers and *deliver* to the Company one share of Common Stock as a contribution to capital." (emphasis added.) Any question as to why Kallop executed that

---

**3.** The 1966 Delaware Study Comment to 6 Del.C. § 8–313 stated, in part:

Under § 191 of the NIL, 6 Del.C. § 291, which defined delivery as the "transfer of possession, actual or constructive from one person to another" and § 22 of the STA, 8 Del.C. § 200, which defined delivery as the "voluntary transfer of possession from one person to another" emphasis was placed on physical transfer of possession of the instrument as the essential element of delivery. Section 8–313(1)(a) is in accord with these provisions.

However, §§ 8–313(1)(b), (c), (d) & (e) are specific enumerations of situations in which delivery will be deemed to have occurred despite the fact that physical transfer to the transferee may not actually yet have occurred. These situations recognize that the bulk of securities transactions are handled by brokers and organized markets and as anticipated by § 8–313(1)(e) are beginning to be transferred in increasing volume on the books of clearing corporations such as those permitted by § 8–320.

agreement is obviated by his concession at trial that at the time he signed the Letter Agreement he fully intended to transfer one share to McAllister Towing. Thus, it was only Citibank's possession of his stock certificate that thwarted the transfer of its physical possession.

It is clear that when McAllister Towing initially acquired McAllister Brothers, Kallop and the other shareholders all agreed that they each held an equal equity interest in McAllister Towing. Recognizing that actually altering his stock certificate was not a convenient option, Kallop executed the Letter Agreement in an effort to memorialize this understanding. After signing the Letter Agreement, Kallop never attempted to rescind it and it has continuously remained in the possession of McAllister Towing. These circumstances adequately support the Vice Chancellor's finding that the execution of the Letter Agreement was sufficient to constitute a constructive delivery of the one share of McAllister Towing stock to the corporation under the common law.

### VIII.

■ Kallop also contends that there could be no constructive delivery of his share of stock in the absence of a recordation of the stock transfer on the books of McAllister Towing. Failure to record a transfer of stock, however, does not affect the validity of a transfer as to the parties to the transaction. *Allen v. Stewart,* Del.Ch., 44 A. 786, 788 (1895); I Folk, *The Delaware General Corporation Law,* § 159.5 (3d ed., 1995); *see* 6 Del.C. § 8–309 (requiring indorsement and delivery before a transfer of stock becomes valid). If the share of McAllister Towing that was the subject of the Letter Agreement had been transferred to a third party, the absence of an entry on the corporate books recording the transfer might merit further analysis. In the present situation however, there are no third party claims pending or implicated and, therefore, we need not further consider the effect of the absence of an entry indicating the transfer here at issue from the books of McAllister Towing.

### IX.

■ The Vice Chancellor also properly rejected the affirmative defenses of waiver, estoppel and laches asserted by Kallop. Kallop's failure to demonstrate that he had suffered any prejudice precludes the application of laches or estoppel. The defense of laches is only tenable when a defendant is prejudiced by a plaintiff's unreasonable delay in bringing suit. *Nationwide Mutual Insurance Co. v. Starr,* Del.Supr., 575 A.2d 1083, 1089 (1990); *Robert O. v. Ecmel A.,* Del. Supr., 460 A.2d 1321, 1325 (1983); *Shanik v. White Sewing Machine Corp.,* Del.Supr., 19 A.2d 831, 837 (1941); *H. & S. Mfg. v. Benjamin F. Rich Co.,* Del.Ch., 164 A.2d 447, 449 (1960). A claim of estoppel similarly requires a showing of detrimental reliance. *Waggoner v. Laster,* Del.Supr., 581 A.2d 1127, 1136 (1990); *Wilson v. American Ins. Co.,* Del.Supr., 209 A.2d 902, 903–04 (1965).

■ The Vice Chancellor found that Kallop had not been prejudiced by any delay by McAllister Towing in asserting its right to the gift of the share of stock Kallop made to the corporation in 1979. We will not disturb this finding of fact as it is a logical conclusion adequately supported by the record. *See Levitt,* 287 A.2d at 673. Accordingly, Kallop's claims of laches and estoppel must fail.

■ The record also shows that Kallop's waiver argument lacks factual support. Kallop contends that the Court of Chancery erred in rejecting this defense because it never considered whether Brian willingly failed to enforce any right he may have had under the Letter Agreement. Waiver, however, requires more than mere inaction. To substantiate his waiver defense, Kallop needed to show that Brian intentionally relinquished his right to rely on the Letter Agreement. *See Realty Growth Inv. v. Council of Unit Owners,* Del.Supr., 453 A.2d 450, 456 (1982) (citations omitted). The facts relied on to establish a waiver "must be unequivocal in character." *Id.,* 453 A.2d at 456 (citing 28 Am.Jur.2d, *Estoppel and Waiver,* § 173 (1966)).

Nothing in the record indicates that Brian ever waived any right to rely on the effectiveness of Kallop's conveyance of stock to

McAllister Towing. The Court of Chancery found that Brian always acted as if he and Kallop owned an equal number of shares in McAllister Towing after the agreement was executed in 1979. The court further found that Brian never conceded that Kallop owned 100 shares of McAllister Towing stock instead of 99 shares. These findings are not inconsistent with the record and adequately support the Court of Chancery's rejection of Kallop's waiver claim. *See Levitt,* 287 A.2d at 673.

## X.

Accordingly, the decision of the Court of Chancery is

**AFFIRMED.**